UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM DEAN HUNTER,

Petitioner,

v.

CASE NO. 09-12562
HONORABLE MARIANNE O. BATTANI

CAROL HOWES,

Respondent.

_______________________________/

**OPINION AND ORDER**
**GRANTING PETITIONER'S MOTION TO AMEND THE HABEAS PETITION,**
**DENYING THE PETITION AND AMENDED PETITION**
**FOR WRIT OF HABEAS CORPUS,**
**DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, BUT**
**GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

Petitioner William Dean Hunter has filed a pro se petition and amended petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his state convictions for assault with intent to commit murder and two firearm offenses. The Court has determined that Petitioner's claims lack merit. Accordingly, the petition and amended petition are denied.

## I. BACKGROUND

### A. The Charges and Trial Testimony

Petitioner was charged in Oakland County, Michigan with assault with intent to commit murder, felon in possession of a firearm, and possession of a firearm during the commission of, or attempt to commit, a felony (felony firearm). The charges arose from an incident that occurred at an apartment in Southfield, Michigan on May 28, 1998.

**1. Prosecution Witnesses**

The victim, Marlita Adams, testified that, in May of 1998, she was married to Johnny Adams, but separated from him. She was introduced to Petitioner through her godfather, Charles Coleman, and became romantically involved with Petitioner after she began working with him and his business partner in a communications business. In May of 1998, she leased an apartment at the Village Green Apartments in Southfield, Michigan. On May 27, 1998, she picked up some things from her former apartment and brought them to the Village Green Apartments where she spent the night with Petitioner.

About 5:00 a.m. on May 28, 1998, she informed her husband over the telephone that she was coming home. Petitioner talked to her husband and said that it would not be a problem if he (Petitioner) and Ms. Adams continued their business relationship. Ms. Adams then hung up the telephone and said good-bye to Petitioner. She grabbed her purse and keys off the counter and walked down the hallway toward the front door of the apartment. She heard a gunshot and thought that Petitioner had shot himself, but when she turned around, she saw that Petitioner was shooting at her. She had been shot in the leg and was bleeding. She told Petitioner to stop shooting because he was killing her, but he kept shooting as he walked toward her. When she kneeled down and begged him to stop shooting, he shot her on the top of her head and said, “Die, bitch.” She was hit three times in the legs and three times in the head. After Petitioner left the apartment, she got up, ran to the bedroom, and called the 911 operator. Petitioner returned to the apartment for his keys and told her to put down the phone. He pointed the gun at her forehead, and pulled the trigger, but there were no more bullets in the

gun. He said, "Damn," and left the apartment a second time.

She went to a neighbor's apartment and banged on the door while talking to the police on the telephone. She informed the police that Petitioner had shot her. She had no further contact with Petitioner after the shooting, and although she went to the hospital for two days, she did not require surgery.

Ms. Adams denied taking anything off the night stand, having a gun in her purse, or reaching for a weapon at the door to the apartment. She admitted that weapons were kept in the store where she and Petitioner had worked, but she said that the weapons were not in her possession.

Heather Reed testified that she was living across the hallway from the victim on May 28, 1998. About 5:00 a.m. that morning she was awakened by the sound of voices. Then she heard someone banging on her door and a woman was screaming that she had been shot and was going to die. The woman had blood on her hands and head, and she was talking on the telephone to a 911 operator. The woman told the 911 operator that a man had shot her approximately six times before he ran out of bullets and left in his car. Ms. Reed had seen the woman's boyfriend in the building on a prior occasion, but she did not see him after the incident on May 28, 1998.

Ayana Renfro testified that on May 28, 1998, she, too, was living at Village Green Apartments in Southfield. About 5:00 a.m. that morning, she heard four to five gunshots and someone moaning or crying. When she looked out her apartment window, she saw a man rush to his car and take off "real fast." She never saw the car again although previously it had always been parked in the same spot.

Police Officer David Crysler testified that he was dispatched to the Village Green

Apartments on May 28, 1998, after receiving information about a shooting. He observed Ms. Adams lying on a couch in apartment 302 with a bloody towel around her head. Ms. Adams informed him that Petitioner had shot her in the head.

Sergeant Gary Lask of the Southfield Police Department was the evidence technician who responded to the crime scene. He testified about the blood, rings, spent casings, and purse that he found in the victim's apartment.

**2. The Defense**

Petitioner was the only defense witness. He testified that he and his business partner, Zachary Wright, owned a communications store, clothing store, and nail shop in the Detroit area. He met Ms. Adams through Charles Coleman and leased an apartment with Ms. Adams at the Village Green Apartments in Southfield. At the time, he owned a .38 caliber gun, which he kept at the store during the day for protection. He bought a .22 caliber gun for Ms. Adams for her safety. Most of the time, the .22 caliber gun was kept in the store, but Ms. Adams had fallen into a habit of carrying it.

On the morning in question, he woke up and heard Ms. Adams talking on the telephone with her husband. He dozed off, but woke up again as Ms. Adams was leaving. He noticed that the .22 caliber gun was on the nightstand, but the .38 caliber gun was not there even though he had put it there the night before. He jumped out of bed and grabbed the .22 caliber gun because he knew Ms. Adams had the .38 caliber gun in her purse. He saw her in the living room facing the door and talking on a cell phone. She turned around and reached inside her purse. Because he thought that she was reaching for a gun, he fired a warning shot. He fired a few more shots and ran up to her to disarm her. He thought his life was in danger, but he did not intentionally shoot

her.

Petitioner went on to say that Ms. Adams did not fall to her knees, nor beg for her life, and at no time during the struggle with Ms. Adams did he intentionally aim the pistol at her. He acquired the .38 caliber gun after she laid down. Then he ran to the bedroom, put on his pants, and left. He forgot his car keys. So, he went back in the apartment and saw Ms. Adams standing in the bedroom talking on the telephone with the 911 operator. He did not point a gun at Ms. Adams' forehead or pull the trigger, and he did not intend to shoot her or hurt her. Although he noticed blood on her, he did not stay or call for help. Instead, he left because he knew the police were coming, and he wanted to get "high."

On cross-examination, Petitioner admitted that he knew a .22 caliber gun can kill someone and that Ms. Adams had been unable to get the gun out of her purse or fire any shots at him. He claimed that gunshots went off during the struggle over the gun.

The defense theory was that Petitioner did not intend to harm Ms. Adams and that she was shot during a struggle over the gun. Defense counsel also argued to the jury that Petitioner may have acted in self-defense and that, at most, he was guilty of assault with intent to commit great bodily harm less than murder.

**B. The Verdict and Sentence**

On August 20, 2002, an Oakland County circuit court jury found Petitioner guilty, as charged, of assault with intent to commit murder, Mich. Comp. Laws § 750.83, felon in possession of a firearm, Mich. Comp. Laws § 750.224f, and felony firearm, Mich. Comp. Laws § 750.227b. The trial court sentenced Petitioner to two years in prison for the felony firearm conviction and to a term of twenty-five to forty years for both the

assault and felon-in-possession convictions.

**C. The Direct Appeal, Post-Conviction Motions, and First Collateral Appeal**

In an appeal of right, Petitioner argued through counsel that he was entitled to a new trial on the assault charge because the trial court failed to fully and accurately instruct the jury on self defense. The Michigan Court of Appeals disagreed and affirmed Petitioner's convictions in an unpublished opinion. See People v. Hunter, No. 244409 (Mich. Ct. App. Feb. 17, 2004). Petitioner raised the same issue in the Michigan Supreme Court, which denied leave to appeal on August 31, 2004, because it was not persuaded to review the issue. See People v. Hunter, 685 N.W.2d 670 (Mich. 2004).

On March 15, 2005, Petitioner filed a motion for relief from judgment through counsel. The trial court never ruled on the motion, and when Petitioner attempted to supplement his motion, the trial court ruled that Petitioner had abandoned his motion through lack of further action. The trial court nevertheless stated that Petitioner could file a subsequent motion for relief from judgment.

Petitioner filed a second motion for relief from judgment, claiming that the trial court erred by denying his request for substitute counsel, by excluding testimony regarding the victim's propensity toward violence, and by giving a jury instruction on flight. He also alleged that trial counsel was ineffective for failing to suppress evidence of his prior conviction, that his sentence was disproportionate and improperly enhanced, and that appellate counsel was ineffective. The trial court denied Petitioner's motion, and the Michigan Court of Appeals denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D). See People v. Hunter, No. 282254 (Mich. Ct. App. July 25, 2008). On January 27, 2009, the Michigan Supreme

Court denied leave to appeal for the same reason. See People v. Hunter, 759 N.W.2d 379 (Mich. 2009).

**D. The Initial Habeas Petition, Stay, and Second Collateral Appeal**

Petitioner filed his habeas corpus petition in this Court on June 30, 2009. He claimed that (1) the trial court failed to fully and accurately instruct the jury on self-defense, (2) there was insufficient evidence to support his assault conviction, (3) the trial court abused its discretion by barring him from introducing evidence of the victim's prior acts of violence, (4) the prosecutor committed misconduct, (5) the trial court abused its discretion by denying his request for a continuance, (6) the trial court erred by admitting evidence of his prior convictions for assault and possession of a weapon, (7) the trial court abused its discretion by allowing the prosecutor to admit evidence of flight and by giving a jury instruction on flight, (8) his sentence of twenty-five to forty years was cruel and unusual punishment, (9) the trial court abused its discretion when it denied his request for substitute appointed counsel, and (10) trial counsel was ineffective for failing to investigate, file a pretrial motion, and call witnesses.

About three months after Petitioner filed his habeas petition, he moved to hold his case in abeyance so that he could pursue additional remedies in state court. On March 2, 2010, the Court granted Petitioner's motion for a stay and closed this case for administrative purposes.

Petitioner then filed a motion for new trial in which he alleged that he was denied a speedy trial and that appellate counsel was ineffective for failing to raise his claim on appeal. The trial court denied Petitioner's motion because the motion was prohibited by Michigan Court Rule 6.502(G), which bars a defendant from filing a second or

subsequent motion for relief from judgment unless the motion is based on a retroactive change in the law or on a claim of new evidence. Petitioner appealed the trial court's decision without success. Both the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal pursuant to Rule 6.502(G). See People v. Hunter, No. 300015 (Mich. Ct. App. Oct. 13, 2010); People v. Hunter, 795 N.W.2d 20 (Mich. 2011).

**E. The Amended Petition and Amended Answer**

On May 3, 2011, Petitioner moved to re-open this case and to lift the stay. The Court granted Petitioner's motion and ordered him to file an amended petition, listing all his claims. Petitioner then filed a motion to amend the petition, which is really an amended petition. Respondent filed an answer to the amended petition, and Petitioner filed a reply to Respondent's answer.

The motion to amend the habeas petition [dkt. #17] is granted. The Court will proceed to address the ten claims raised in the amended petition and the two claims that Petitioner raised in the initial habeas, but not in the amended petition. The twelve claims are: (1) the trial court failed to accurately instruct the jury on the defense theory; (2) the trial court erred by denying Petitioner's request for substitution of counsel; (3) the trial court erred by preventing Petitioner from admitting evidence of the complainant's violent character; (4) the trial court erred by instructing the jury on flight; (5) the minimum sentence violates the principle of proportionality; (6) the sentence was improperly enhanced; (7) the prosecutor committed misconduct; (8) the trial court abused its discretion by denying Petitioner's request for a continuance; (9) trial counsel was ineffective; (10) Petitioner's right to a speedy trial was violated; (11) the evidence

was insufficient to support Petitioner's assault conviction; and (12) evidence of Petitioner's prior conviction was erroneously admitted at trial.

Respondent maintains that claims six, seven, eight, nine, and eleven are procedurally defaulted because Petitioner did not properly raise those claims in state court and he is now foreclosed from pursuing any additional state court remedies. Procedural default is not a jurisdictional limitation, Pudelski v. Wilson, 576 F.3d 595, 606 (6th Cir. 2009), cert. denied, __ U.S. __, 130 S. Ct. 3274 (2010), and Petitioner's claims lack merit. The Court therefore will address all of Petitioner's claims on the merits rather than analyze whether the claims are procedurally defaulted.

## II. STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." Harrington v. Richter, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, state prisoners are not entitled to the writ of habeas corpus unless the state court's adjudication of their claims on the merits

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a

> case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S. Ct. at 786. To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on a claim "was so lacking in justification" that it resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87. When no state court adjudicated the merits of a petitioner's claims, review is de novo, and AEDPA deference does not apply. See Dorn v. Lafler, 601 F.3d 439, 443 (6th Cir. 2010).

## III. DISCUSSION

### A. The Right to a Speedy Trial

The Court begins its discussion with Petitioner's claim that his right to a speedy trial was violated by the delay in bringing him to trial. Petitioner also claims that his appellate attorney was ineffective for failing to raise his speedy trial claim on direct appeal.

The Constitution guarantees a criminal defendant the right to a speedy trial. U.S. Const. amend. VI. To determine whether a petitioner's right to a speedy trial was violated, courts consider the following four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4)

any prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 530 (1972).

"The length of the delay is measured from the date of the indictment or the date of the arrest, whichever is earlier." Maples v. Stegall, 427 F.3d 1020, 1026 (6th Cir. 2005) (citing United States v. Marion, 404 U.S. 307, 320 (1971), and Redd v. Sowders, 809 F.2d 1266, 1269 (6th Cir. 1987)). "A delay approaching one year is presumptively prejudicial and triggers application of the remaining three factors." Id. (citing Doggett v. United States, 505 U.S. 647, 652 n. 1 (1992)).

"If the length of the delay is not 'uncommonly long', then judicial examination ends." Id. at 1025 (citing Doggett, 505 U.S. at 652). In other words, "[t]he length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." Barker, 407 U.S. at 530.

The crimes in this case occurred in May of 1998. Petitioner alleges that he spent a month in a Texas hospital that year and worked in Miami, Florida from 1999 to 2001. He claims that he returned to Michigan in December of 2001 and learned then that there was an outstanding warrant for his arrest. He subsequently reported to the police department in Detroit and was arrested in February of 2002 while attending an Alcoholics Anonymous meeting. His trial began on August 19, 2002.

The delay from arrest to trial was less than seven months. Because it was not "uncommonly long," there is no need to inquire into the other Barker factors. Petitioner's Sixth Amendment right to a speedy trial was not violated, and because his claim lacks merit, defense counsel was not ineffective for failing to raise the claim on direct appeal. Greer v. Mitchell, 264 F.3d 663, 676 (6th Cir. 2001).

To the extent Petitioner is complaining about pre-arrest delay, his claim lacks merit because he caused the delay by leaving the State and evading the police. The prosecutor stated at the preliminary examination that the FBI spent four years looking for Petitioner and was unable to locate him. (Tr. Jan. 29, 2002, at 24.) Petitioner's allegation that he did not know the police were looking for him is incredulous. He apparently had prior conviction for a similar offense (Tr. Sept. 25, 2002, at 9) and, in this case, he shot someone who could identify him, and he deserted the victim while she was bleeding from her wounds.

Petitioner also has not shown that he was prejudiced by the delay or that the delay was an intentional device by the prosecution to gain a tactical advantage over him. For this additional reason, his right to due process was not violated by the pre-arrest delay. United States v. Lovasco, 431 U.S. 783, 789-90 (1977); United States v. Brown, 959 F.2d 63, 66 (6th Cir. 1992).

**B. The Denial of Petitioner's Request for Substitution of Counsel**

Petitioner alleges that the trial court deprived him of a fair trial and his right to effective assistance of counsel by denying his request for substitution of counsel. Petitioner claims that his trial attorney neglected his case, was unprepared for trial, and did not communicate with him. He contends that the trial court forced him to represent himself or to continue with an ineffective attorney.

The trial court rejected Petitioner's claim when addressing his motion for relief from judgment. The court stated that Petitioner had failed to establish good cause for substitution of counsel and that granting his request would have unreasonably disrupted the judicial process.

**1. Clearly Established Federal Law**

A defendant in a criminal case has a right to the assistance of counsel in his defense. U.S. CONST. amend. VI; Faretta v. California, 422 U.S. 806, 807(1975). An indigent defendant, however, "has no right to choose his counsel." Montejo v. Louisiana, 556 U.S. 778, __, 129 S. Ct. 2079, 2084 (2009) (citing United States v. Gonzales-Lopez, 548 U.S. 140, 151 (2006)).

> When an accused seeks substitution of counsel in mid-trial, he must show good cause such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict with his attorney in order to warrant substitution.
>
> Consideration of such motions requires a balancing of the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice . . . .

Wilson v. Mintzes, 761 F.2d 275, 280 (6th Cir. 1985) (citations omitted). "A defendant can only succeed in demonstrating 'good cause' for substitution [of counsel] by showing a total lack of communication with his attorney resulting in an inadequate defense." United States v. Namer, 149 F. App'x 385, 394 (6th Cir. 2005) (citing United States v. Jennings, 83 F.3d 145, 148 (6th Cir. 1996)).

**2. Application**

Before Petitioner's trial began, he complained to the trial court that his attorney did not know anything about his case or his witnesses. He stated that he did not hear from his attorney for four months and then, two weeks before trial, the attorney told him that he was ready for trial. (Tr. Aug. 19, 2002, at 4–5.)

Defense counsel stated in response to Petitioner's allegations that he saw Petitioner four times and that Petitioner had refused to talk about his defense the night

before trial. As for being prepared and investigating witnesses, defense counsel stated that Petitioner had mentioned three witnesses to him: a stripper from New York, his business partner, and attorney Paul Curtis. Petitioner did not know the name of the New York stripper or where to locate his business partner, and although defense counsel did contact attorney Paul Curtis, Mr. Curtis denied everything that Petitioner had said about him. (Id. at 6-12.)

The trial court determined that none of the suggested defense witnesses would be helpful to Petitioner because they were not eyewitnesses and their testimony dealt with collateral matters. And even though the trial court previously received a letter from Petitioner in which Petitioner requested a different attorney, the court stated that it planned to proceed with the trial. The court gave Petitioner the option of representing himself or of continuing with his appointed attorney. The court declined to appoint a different attorney, stating that Petitioner's attorney was one of the best criminal defense attorneys in Oakland County. Petitioner chose to continue with his present attorney, and the trial court asked the prosecutor and defense counsel to check on the witnesses that Petitioner had requested. (Id. at 13-17.)

Defense counsel periodically reported back to the trial court on his attempts to reach potential witnesses. He determined that some witnesses could not be reached and that the others would not be helpful to the defense.

The record does not support Petitioner's contention that there was a complete breakdown in the attorney/client relationship. Petitioner's concern about defense witnesses was thoroughly addressed by his attorney, and he raised no further complaints about the attorney after the trial commenced. He also did not exhibit any

antagonism toward the attorney during the attorney's direct and re-direct examination of him.

Any lack of communication which resulted from Petitioner's refusal to talk with his attorney before trial did not constitute "good cause" for substituting counsel. United States v. Marrero, 651 F.3d 453, 466 (6th Cir. 2011) (citing United States v. Vasquez, 560 F.3d 461, 468 (6th Cir. 2009)), cert denied, __ S. Ct. __, No. 11-7354, 2012 WL 33562 (U.S. Jan. 9, 2012). And the initial conflict between Petitioner and his attorney was not "so great that it resulted in a total lack of communication preventing an adequate defense." Jennings, 83 F.3d at 149.

The trial court's finding of insufficient cause for substitution of counsel was proper, and because it was proper, " it was also proper to explain to [Petitioner] that he was thus left with only two options: keeping this lawyer or proceeding pro se." United States v. Eltayib, 88 F.3d 157, 168 (2d Cir. 1996) (quoted with approval in Marrero, 651 F.3d at 466). Petitioner has no right to relief on the basis of the trial court's denial of his request for substitution of counsel.

**C. The Denial of a Continuance for Medical Reasons**

Petitioner alleges that the trial court abused its discretion and deprived him of the right to testify with a sound mind by denying his request for a continuance due to medical problems. Petitioner claims that he did not receive his medication for two days and that he was tired as a result of not getting enough sleep.

**1. Clearly Established Federal Law**

A defendant in a criminal case possesses a constitutional right to testify in his own defense, Rock v. Arkansas, 483 U.S. 44, 51 (1987), and a right "not to be tried

unless he is competent," Godinez v. Moran, 509 U.S. 389, 396 (1993). But

> [t]rial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances . . . .

Morris v. Slappy, 461 U.S. 1, 11 (1983). "The mere possibility of an adverse effect on a party's wellbeing is not enough to warrant a postponement." United States v. Zannino, 895 F.2d 1, 13 (1st Cir. 1990).

**2. Application**

Petitioner first raised the matter of his physical and mental condition on the second day of trial, minutes before he was scheduled to testify. In the jury's absence, he informed the trial court that he was "sick as a dog" and felt "terrible" due to "some kind of anxiety attack" and lack of sleep during the previous night. He requested a postponement of the trial so that he could get some rest. After the trial court pointed out that the jury was waiting, the court asked Petitioner whether he planned to take the stand that day. Petitioner answered in the affirmative.

Petitioner's wife of thirty-four years then introduced herself and indicated that she was there to support Petitioner. The court said to Mrs. Hunter, "Tell him he can do it. If he wants to do it, you're here to support him." Mrs. Hunter said, "William, you can do it." The trial court then asked for the jury, and Petitioner proceeded to testify. (Tr. Aug. 20, 2002, at 7-9.)

During his testimony, Petitioner stated a few times that he was tired (id. at 15, 50), and he had to be encouraged to speak up (id. at 10, 22, 28). But there is no

indication that he was physically or mentally incapable of testifying in his own behalf. The trial court therefore did not deprive Petitioner of due process, a fair trial, or the right to be tried while competent when it exercised its discretion to deny a continuance.

**D. Alleged Evidentiary Errors**

Petitioner asserts that the trial court erred by preventing him from admitting evidence of the complainant's violent character and by allowing the prosecutor to admit evidence of Petitioner's prior conviction. "Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." McAdoo v. Elo, 365 F.3d 487, 494 (6th Cir. 2004) (citing Estelle v. McGuire, 502 U.S. 62, 69-70 (1991)). Stated differently, the Court "cannot grant the writ based on [its] disagreement with 'state-court determinations on state-law questions,' unless the state-court determination is so 'fundamentally unfair' that it deprives a defendant of due process." Wynne v. Renico, 606 F.3d 867, 871 (6th Cir. 2010) (internal and end citations omitted), cert. denied, __ U.S. __, 131 S. Ct. 2873 (2011). For the following reasons, the alleged evidentiary errors in this case did not result in a fundamentally unfair trial.

**1. Evidence of the Victim's Character**

Petitioner asserts that the trial court prevented him from eliciting testimony concerning the victim's violent character and an incident where the victim reached for a gun during a confrontation with Melody Merchant. The court's ruling, according to Petitioner, deprived him of his right of confrontation, his right to present a defense, and

his right to a fair trial.

The trial court reviewed Petitioner's claim on state collateral review and concluded that Petitioner had no right under state law to introduce evidence of the victim's aggressive character. The trial court rejected Petitioner's claim under the Confrontation Clause because Petitioner testified at trial that he purchased a gun for Ms. Adams and that she sometimes carried the gun in her purse.

**a. Clearly Established Federal Law**

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)), but the right to present evidence is subject to reasonable restrictions, United States v. Scheffer, 523 U.S. 303, 308 (1998). Trial judges may exclude evidence that is "only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues." Holmes v. South Carolina, 547 U.S. 319, 326 (2006) (quotation marks and citations omitted) (bracket in original)

The Constitution also guarantees defendants in criminal cases the right to confront the witnesses against them, and this right includes the right to cross-examine witnesses. Richardson v. Marsh, 481 U.S. 200, 206 (1987) (citing Pointer v. Texas, 380 U.S. 400, 404, 406-07 (1965)). However,

> [w]here it is merely the extent of cross-examination that is limited, the trial judge retains a much wider latitude of discretion, though of course that discretion may be abused.
>
> [T]he test in such circumstances is whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory. "[O]nce cross-examination reveals sufficient information to appraise the witnesses' veracity, confrontation demands are satisfied."

Dorsey v. Parke, 872 F.2d 163, 167 (6th Cir. 1989) (citations omitted).

**b. Application**

On cross examination of Marlita Adams, defense counsel asked Ms. Adams whether there had been a confrontation between her and Melody Merchant at Petitioner's store and whether Ms. Adams had grabbed a weapon, which was kept in the store. The prosecutor objected before Ms. Adams could answer. Defense counsel insisted that he had a right to show that Ms. Adams was known to carry weapons, but the trial court failed to see the relevance of the question and sustained the prosecutor's objection. (Tr. Aug. 19, 2002, at 162-63.)

Prior to defense counsel's question about Melody Merchant, defense counsel questioned Ms. Adams about whether she possessed the .22 caliber handgun that Petitioner had purchased for her. Defense counsel also asked Ms. Adams whether she possessed a .38 caliber gun as a result of her responsibilities at the store and whether weapons were kept under the counter at the store. (Id. at 161-62.) Ms. Adams denied possessing a gun at the store, but Petitioner subsequently testified that he purchased the .22 caliber gun for Ms. Adams and that he knew she carried the gun. (Tr. Aug. 20, 2002, at 16-18, 39.)

The jury had enough information, despite the limits placed on defense counsel's cross-examination of Ms. Adams, to appraise Ms. Adams' credibility and to assess the defense theory that Ms. Adams was known to carry weapons. Therefore, Petitioner's right to present a defense and his right to confront the witnesses against him were satisfied.

**2. Evidence of Petitioner's Prior Conviction**

Petitioner's criminal history included convictions for assault and possession of a weapon. Because he was on trial for assault with intent to commit murder, he claims that he was denied his constitutional rights to due process and a fair trial by the admission of evidence about the prior convictions. He contends that the probative value of the evidence was outweighed by the danger of unfair prejudice.

Petitioner's prior convictions for assault and possession of a weapon were the basis for the charge of felon in possession of a firearm. (Tr. Aug. 19, 2002, at 41.) Furthermore, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir. 2003). Because no constitutional right was violated, Petitioner's claim is not cognizable on federal habeas review. Bey v. Bagley, 500 F.3d 514, 523 (6th Cir. 2007).

**E. The Prosecutor**

Petitioner alleges next that the prosecutor committed misconduct by failing to disclose a 911 tape, by failing to produce witnesses, and by misstating the evidence or eliciting false testimony.

**1. The 911 Tape**

Petitioner contends that the prosecutor failed to disclose the audio recording of Ms. Adams' call to the 911 operator of the Southfield Police Department on May 28, 1998. Petitioner claims that nondisclosure of the tape prevented him from refuting Ms. Adams' testimony that he re-entered their apartment while she was making the call and then pointed a gun at her head and ordered her to put down the phone.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). "[E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Cone v. Bell, 556 U.S. 449, __, 129 S. Ct. 1769, 1783 (2009).

At the preliminary examination in this case, defense counsel requested forensic reports and a copy of the recording of Ms. Adams' call to the 911 operator on the day of the shooting. Although the crimes occurred four years earlier, the prosecutor thought that most of the items requested by defense counsel were available. She promised to provide them to defense counsel as soon as she received them. (Tr. Jan. 29, 2002, at 22-23.)

No further mention was made of the recording at trial. This does not mean that the prosecutor suppressed the evidence. It appears more likely that the recording was no longer available due to routine destruction of recordings after a period of time.

To the extent Petitioner is claiming that the police failed to preserve the recording, his claim lacks merit because

> [w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Trombetta, 467 U.S. at 488-489 (internal citation and footnote omitted). A defendant is

not deprived of due process unless he can show bad faith on the part of the police in failing to preserve potentially useful evidence. Arizona v. Youngblood, 488 U.S. 51, 58 (1988).

Petitioner has not shown any bad faith on the part of the police, and he merely speculates that the 911 recording would have enabled him to refute Ms. Adams' testimony. Any exculpatory value to the recording would not have been apparent before the recording was destroyed.

Even if Petitioner could have refuted Ms. Adams' testimony about him re-entering their apartment and pointing a gun at her, the other evidence against him was sufficient to sustain confidence in the verdict. Thus, the undisclosed evidence was not material evidence. See Smith v. Cain, __ U.S.__, __, 132 S. Ct. 627, 630 (2012) (stating that "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict"). Petitioner has no right to relief on the basis of his claim that the prosecutor suppressed or destroyed evidence.

**2. Trial Errors**

Petitioner's remaining claims of error regarding the prosecutor allege that the prosecutor failed to produce witnesses and elicited false testimony or misstated the evidence.[1] "Claims of prosecutorial misconduct are reviewed deferentially on habeas review." Millender v. Adams, 376 F.3d 520, 528 (6th Cir. 2004) (citing Bowling v. Parker, 344 F.3d 487, 512 (6th Cir. 2003)). To prevail on a prosecutorial-misconduct

[1] Although Petitioner asserts in the heading for his claim that the prosecutor also vouched for her witnesses, Petitioner has not cited any examples of vouching or bolstering. The Court considers the claim abandoned.

claim, a habeas petitioner must demonstrate that the prosecutor's conduct infected his trial with such unfairness as to make the resulting conviction a denial of due process. Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). The misconduct must have been "so egregious as to render the entire trial fundamentally unfair." Cook v. Bordenkircher, 602 F.2d 117, 119 (6th Cir. 1979). Federal courts in this Circuit

> apply a "two-part test to determine whether the state court reasonably applied the federal standard in holding that prosecutorial misconduct did not render [the petitioner's] trial fundamentally unfair." Irick v. Bell, 565 F.3d 315, 324 (6th Cir. 2009). [Courts] first determine whether the prosecution's conduct was improper. Id. Second, [courts] determine whether that improper conduct was flagrant by considering four factors: "(1) whether the evidence against the defendant was strong; (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally." Id. (internal quotation marks omitted).

Wogenstahl v. Mitchell, __ F.3d __, __, No. 07-4285, 2012 WL 310819, at *14 (6th Cir. Feb. 2, 2012).

**a. Failure to Produce Witnesses**

Petitioner faults the prosecutor for not compelling the attendance of Charles Coleman and Johnny Adams. Petitioner says that he wanted to conduct a hearing with Coleman and Adams to elicit information about Ms. Adams' habit of carrying a gun.

When defense counsel contacted Mr. Coleman, Coleman informed him that he thought Petitioner was "some type of psycho" and that Petitioner lied about everything. (Tr. Aug. 20, 2002, at 3-4.) Defense counsel attempted to contact Mr. Adams, but Adams did not return counsel's calls. Nor did he return calls made to him by the police. (Id. at 4, 6.)

Mr. Adams clearly was uncooperative, and Mr. Coleman would not have helped

the defense. Moreover, the evidence against Petitioner was strong. Therefore, the prosecutor's alleged failure to compel the attendance of Coleman and Adams did not render Petitioner's trial unfair. Petitioner is not entitled to relief on his claim that the prosecutor failed to produce witnesses.

**b. False Testimony; Misstating the Evidence**

The prosecutor maintained at trial that Petitioner fired at Ms. Adams eight times and actually shot her five times. (Tr. Aug. 19, 2002, at 95-96; Aug. 20, 2002, at 103-04.) But during the prosecutor's direct examination of Marlita Adams, Ms. Adams testified that she was hit six times. (Tr. Aug. 19, 2002, at 140, 142-43.) Petitioner concludes from the discrepancy between Ms. Adams' testimony and the prosecutor's argument that the prosecutor elicited false evidence from Ms. Adams. As another example of eliciting false evidence, Petitioner alleges that Sergeant Gary Lask testified about finding three bullets at the crime scene, but Lask's evidence-collection report states that he found five bullets.

Prosecutors may not deceive a court or jury by soliciting false evidence or by allowing false evidence to go uncorrected when it appears. Giglio v. United States, 405 U.S. 150, 153 (1972). Nevertheless, "mere inconsistencies in testimony by government witnesses do not establish knowing false testimony." United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir. 1989). Furthermore, neither the exact number of bullets found at the crime scene, nor the exact number of times that the victim was hit was critical evidence. Therefore, the alleged misconduct could not have mislead the jury or prejudiced the defense. The prosecutor's conduct was not improper, and, even if it was, the impropriety was not flagrant.

**F. The Sufficiency of the Evidence**

Petitioner asserts that the evidence was insufficient to support his conviction for assault with intent to commit murder. The relevant question on habeas review of a sufficiency-of-the-evidence claim "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Id. at 324 n.16. "The elements of assault with intent to commit murder are '(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder.'" People v. Ericksen, 793 N.W.2d 120, 122 (Mich. Ct. App. 2010) (quoting People v. Brown, 703 N.W.2d 230, 236 (Mich. Ct. App. 2005)), appeal denied, 794 N.W.2d 598 (Mich. 2011).

Ms. Adams testified that Petitioner shot her multiple times and that she thought she was dying. This testimony was sufficient to show that Petitioner assaulted Ms. Adams. And if the assaults had been successful, Ms. Adams surely would have died, and the crime would have been murder. Thus, the prosecutor proved the first and third elements of assault with an intent to commit murder.

The critical question at trial was whether Petitioner had the intent to kill Ms. Adams. The record indicates that he fired at Ms. Adams several times and said, "Die, bitch," during the shooting. He subsequently pressed the gun against Ms. Adams' forehead, pulled the trigger, and expressed disappointment when no bullet came out of the gun. Petitioner's comments and the multiple gunshots are indications that he

intended to kill Ms. Adams.

Petitioner, however, maintains that the prosecution failed to disprove his defense of self-defense. In Michigan, an assault in self-defense is justified "if the defendant honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm." People v. Heflin, 456 N.W.2d 10, 18 (Mich. 1990). "Once evidence of self-defense is introduced, the prosecutor bears the burden of disproving it beyond a reasonable doubt." People v. Fortson, 507 N.W.2d 763, 767 (Mich. Ct. App.1993) (citing People v. Bell, 399 N.W.2d 542 (Mich. Ct. App. 1986)).

Ms. Adams testified that she was facing away from Petitioner when he first shot her. He subsequently shot her on the top of her head as she was kneeling and begging for her life. (Tr. Aug. 19, 2002, at 140-142.) Although Petitioner testified that Ms. Adams had a gun in her purse and had turned to face him, he admitted that she was unable to get the gun out of her purse or to fire at him. (Tr. Aug. 20, 2002, at 88, 92.) The jury could have concluded that Petitioner did not honestly and reasonably believe his life was in imminent danger or that there was a threat of serious bodily harm.

The evidence, taken in the light most favorable to the prosecution, established the elements of assault with intent to commit murder and disproved Petitioner's self-defense theory. Therefore, Petitioner has no right to relief on the basis of his sufficiency-of-the evidence claim.

**G. Trial Counsel**

Petitioner alleges that his trial attorney was ineffective. Specifically, Petitioner contends that his attorney failed to investigate witnesses, stipulated to medical records and Petitioner's criminal history, and failed to object to the amended indictment, which

charged Petitioner with being a habitual offender. Petitioner contends that the cumulation of these errors caused the jury to look at him with jaundiced eyes and that appellate counsel was ineffective for not raising his claim about trial counsel in the appeal of right.

**1. Clearly Established Law**

The Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), is clearly established federal law for purposes of evaluating an ineffective-assistance-of-counsel claim. Cullen v. Pinholster, __ U.S. __, __, 131 S. Ct. 1388, 1403 (2011). Under Strickland, an attorney is constitutionally ineffective if his or her "performance was deficient" and "the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. The same standard applies to claims about appellate counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000).

To establish deficient performance, a habeas petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

To demonstrate that counsel's performance prejudiced the defense, a habeas petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "This

does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." Richter, 131 S. Ct. at 792 (quoting Strickland, 466 U.S. at 693). "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Id. at 788 (internal and end citations omitted).

**2. Failure to Call Witnesses**

Petitioner asserts that his attorney should have investigated witnesses, who knew that Ms. Adams regularly carried a gun and reached for a gun on one occasion to settle a dispute. Attorneys have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." Rompilla v. Beard, 545 U.S. 374, 383 (2005).

The record indicates that defense counsel did investigate the witnesses suggested by Petitioner at trial. His investigation was hindered because Petitioner did not know the name of one potential witness, nor the address of his business partner. And when defense counsel contacted attorney Paul Curtis at Petitioner's suggestion, Mr. Curtis stated that he did not know whether Ms. Adams owned or carried a gun. Defense counsel had the impression that Mr. Curtis would be a hostile witness and would have no information on any defense that Petitioner wished to use. (Tr. Aug. 19,

2002, at 127-29.)

Petitioner desired to call Ms. Adams' godfather, Charles Coleman, as a witness, but defense counsel thought that Mr. Coleman also would be a hostile witness. Defense counsel personally spoke to Mr. Coleman after the first day of trial. Coleman then informed defense counsel that he thought Petitioner was "some type of psycho" and that he (Mr. Coleman) had "never known Ms. Adams to own a gun, carry a gun, be around guns or have anything to do with guns." (Tr. Aug. 20, 2002, at 3-4.) Mr. Coleman thought that Petitioner was lying about everything. (Id. at 4.)

Petitioner also wanted defense counsel to interview Ms. Adams' ex-husband, Johnny Adams. (Tr. Aug. 19, at 33-34.) Defense counsel attempted to contact Mr. Adams to determine whether he knew if Ms. Adams carried a weapon, but Mr. Adams did not return telephone calls from defense counsel or the police. (Tr. Aug. 20, 2002, at 4, 6.)

Petitioner requested Melody Merchant as a witness because he anticipated that Ms. Merchant would say Ms. Adams had reached for a gun during a confrontation with Ms. Merchant at Petitioner's store. (Tr. Aug. 19, 2002, at 8.) Defense counsel, however, stated that Petitioner had not mentioned Ms. Merchant to him before trial (id. at 8, 24) and that Ms. Merchant had not returned defense counsel's telephone calls. Petitioner, moreover, admitted to defense counsel that Ms. Merchant would not know whether Ms. Adams carried a gun. (Tr. Aug. 20, 2002, at 4.)

In conclusion, the record indicates that defense counsel did investigate potential defense witnesses and that the witnesses either did not respond to counsel's calls or they would not have helped the defense. Defense counsel's choices were reasonable

and did not constitute deficient performance.

**3. Stipulations**

Petitioner faults his attorney for stipulating to the victim's medical records and to Petitioner's criminal history in New York. The criminal history, however, consisted of self-authenticating court documents, and the prosecutor was prepared to introduce the documents through an officer who had no personal knowledge of them. (Tr. Aug. 19, 2002, at 186-87.) Consequently, defense counsel was not ineffective for stipulating to the admission of the documents.

As for Ms. Adams' medical records, defense counsel stated that he had reviewed them and that he would stipulate to them to avoid having to bring in the physicians who treated Ms. Adams. (Id. at 150-51.) Had the physicians testified, they likely would have discussed the nature of Ms. Adams' injuries and possibly confirmed her testimony that she was shot at least one time from behind. This testimony would have supported the prosecutor's argument that Petitioner did not shoot in self-defense. It was reasonable trial strategy to stipulate to the admission of Ms. Adams' medical records.

**4. Failure to Object**

Petitioner's final claim about his attorney is that the attorney failed to object to the amended indictment, which charged Petitioner with being a habitual offender. Petitioner appears to be alleging that his sentence should not have been enhanced on the basis of convictions that occurred more than ten years before his trial and conviction in this case.

The applicable habitual offender statute authorizes an enhanced sentence "[i]f a person has been convicted of any combination of 3 or more felonies or attempts to

commit felonies . . . , and that person commits a subsequent felony within this state . . . ." Mich. Comp. Laws § 769.12(1). The statute does not state that only convictions obtained within the previous ten years may be considered at sentencing.

Furthermore, Petitioner admitted at the conclusion of his trial that he had three prior convictions. (Tr. Aug. 20, 2002, at 134-35.) An objection to the habitual offender notice would have lacked merit, and an attorney is not required to raise a meritless argument to avoid a charge of ineffective assistance. Ludwig v. United States, 162 F.3d 456, 459 (6th Cir. 1998).

None of Petitioner's claims about trial counsel have merit. And although he claims that the cumulative effect of counsel's errors prejudiced him, constitutional errors that would not individually support habeas relief cannot be cumulated to support habeas relief. Moore v. Parker, 425 F.3d 250, 256 (6th Cir. 2005). Petitioner therefore has no right to habeas relief on his ineffective-assistance-of-counsel claims.

**H. The Jury Instructions**

Petitioner alleges that the trial court failed to accurately instruct the jury on the defense theory and erred by instructing the jury on flight. The question on habeas corpus review of jury instructions is whether the instruction violated some right guaranteed the defendant by the Fourteenth Amendment or infected the entire trial to the extent that the resulting conviction violates due process. Cupp v. Naughten, 414 U.S. 141, 146-47 (1973). "To warrant habeas relief because of incorrect jury instructions, Petitioner must show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair." Murr v. United States, 200 F.3d

895, 906 (6th Cir. 2000) (citing McGuire, 502 U.S. at 72).

**1. The Defense Theory**

Petitioner contends that the trial court failed to properly instruct the jury on self defense and thereby deprived him of a fair trial and his right to present a substantial defense. The Michigan Court of Appeals adjudicated this claim in the appeal of right and stated that Petitioner forfeited the error when he failed to object or to request an instruction on self defense at trial. The Court of Appeals nevertheless determined that the evidence did not support the giving of an instruction on self defense and that there was no instructional error.

**a. Legal Framework**

A defendant is entitled to a jury instruction on "any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Matthews v. United States, 485 U.S. 58, 63 (1988) (citing Stevenson v. United States, 162 U.S. 313 (1896); C. Torcia, Wharton's Criminal Procedure § 538, p. 11 (12th ed. 1976)). Petitioner claims that he had a right to a jury instruction on self defense. In Michigan, however, a crime committed in self defense is justified "only if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself." People v. Riddle, 649 N.W.2d 30, 38 (Mich. 2002).

**b. Application**

The trial court did not explain the concept of self defense to Petitioner's jury, nor instruct the jury on how to evaluate the defense. Instead, the trial court merely stated

that Petitioner did not have to prove that he acted in self defense and that the prosecutor had to prove beyond a reasonable doubt that Petitioner did not act in self-defense. (Tr. Aug. 20, 2002, at 120.)

However, as noted above, Ms. Adams testified that she was unarmed and that she was leaving the apartment when Petitioner first fired at her. Although Petitioner maintained that Ms. Adams had a gun in her purse and was reaching for it, he admitted that Ms. Adams was unable to retrieve the gun from her purse and did not fire at him. (Id. at 88, 90, 92.)

The record indicates that Petitioner was the initial aggressor and that he shot Ms. Adams in a vulnerable part of her body more than once without justification. There was insufficient evidence that he honestly and reasonably believed his life was in imminent danger or that he was threatened with serious bodily harm. The jurors in all likelihood would not have concluded that Petitioner acted in self defense even if they had been instructed on the defense. Consequently, the lack of a substantial jury instruction on self defense could not have had a "substantial and injurious effect or influence" on the jury's verdict. Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). The alleged error was harmless.

**2. The Instruction on Flight**

Petitioner alleges that the trial court deprived him of a fair trial by giving a jury instruction on flight. According to him, the evidence did not support the inference that he fled to avoid detection or because of consciousness of guilt. The trial court rejected this claim as "disingenuous" when ruling on Petitioner's motion for relief from judgment.

In Michigan, "evidence of flight is admissible to support an inference of

'consciousness of guilt' and the term 'flight' includes such actions as fleeing the scene of the crime." People v. Goodin, 668 N.W.2d 392, 396 (Mich. Ct. App. 2003) (citing People v. Coleman, 532 N.W.2d 885, 887 (Mich. Ct. App. 1995)). Although the United States Supreme Court and the United States Court of Appeals for the Sixth Circuit are skeptical about the probative value of such evidence, Parker v. Renico, 506 F.3d 444, 450-51 (6th Cir. 2007), Petitioner admitted that he left the apartment even though the victim was bleeding because he knew the police were coming.

The trial court, moreover, informed the jury that, although a person may run or hide because of a consciousness of guilt, such evidence does not necessarily prove guilt. The court explained that a person may run or hide "for innocent reasons such as panic, mistake or fear." (Tr. Aug. 20, 2002, at 119.) The trial court instructed the jury to decide whether the evidence of flight was true and, if true, whether it showed that Petitioner had a guilty state of mind. (*Id*. at 119-20.) The instruction on flight did not infuse the trial with such unfairness as to deny Petitioner due process of law, and he is not entitled to habeas corpus relief. McGuire, 502 U.S. at 75 (quoting Lisenba v. California, 314 U.S. 219, 228 (1941)).

**I. The Sentence**

**1. Proportionality**

Petitioner asserts that his minimum sentence of twenty-five years violates the principle of proportionality. He claims that he had a regular work record, owned his own business, and was a productive member of society. He maintains that he is not a hardened criminal and that his sentence was unreasonable. The trial court noted on review of this claim that Petitioner had an extensive criminal history, which included

several crimes involving assaults and weapons, and that the instant offense also was violent. The court concluded that Petitioner's minimum sentence did not violate the principle of proportionality.

A plurality of the Supreme Court has stated that "the Eighth Amendment contains no proportionality guarantee." Harmelin v. Michigan, 501 U.S. 957, 965 (1991). "Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." Id. at 1001 (Kennedy, J., concurring) (quoting Solem v. Helm, 463 U.S. 277, 288 (1983)). "Applying this principle, the plurality in Harmelin rejected the defendant's assertion that his sentence of life imprisonment without parole was grossly disproportionate to the crime since he was a first-time felony offender in possession of 650 grams of cocaine." United States v. Kelsor, 665 F.3d 684, __, No. 10-3034, 2011 WL 6350637, at *12 (6th Cir. Dec. 20, 2011).

Petitioner was fifty-five years of age at his sentencing, and his minimum sentence was twenty-five years. He could spend all or most of the remainder of his life in prison. Nevertheless, he was a repeat felony offender, and he shot Ms. Adams several times, including a few times in the head. If Harmelin's sentence of life imprisonment without the possibility of parole for a nonviolent offense was not grossly disproportionate, Petitioner's minimum sentence of twenty-five years for a violent crime was not cruel and unusual punishment in violation of the Eighth Amendment. Furthermore, the sentence did not exceed the statutory maximum of life imprisonment or any term of years. See Mich. Comp. Laws § 750.83. "'[A] sentence within the statutory maximum set by statute generally does not constitute 'cruel and unusual punishment.' " Austin v. Jackson, 213 F.3d 298, 302 (6th Cir. 2000) (quoting United

States v. Organek, 65 F.3d 60, 62 (6th Cir. 1995) (quoting United States v. Williams, 15 F.3d 1356, 1364 (6th Cir.1994)). Petitioner has no right to relief on the basis of his claim that his sentence was disproportionate to the crime and the offender.

**2. Apprendi; Blakely**

Petitioner also alleges that his sentence was improperly enhanced on the basis of facts which he did not admit and which were not determined by the jury. This claim is based on Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004). The trial court rejected Petitioner's claim because Petitioner had not shown that his sentence was invalid and because the Michigan Supreme Court has held that Blakely does not apply in Michigan. See People v. Drohan, 715 N.W.2d 778, 791-92 (Mich. 2006); People v. Claypool, 684 N.W.2d 278, 286 n.14 (Mich. 2004).

In Apprendi, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490. In Blakely, the Supreme Court stated "that the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 542 U.S. at 303 (emphasis omitted).

Unlike the determinate sentencing scheme at issue in Blakely, Michigan has an indeterminate sentencing scheme in which "[t]he maximum penalty is set by statute, but the minimum penalty is determined by the sentencing court and must fall within a mandated guidelines range. " Montes v. Trombley, 599 F.3d 490, 496 (6th Cir. 2010) (citing Drohan, 715 N.W.2d at 790). "Apprendi's rule does not apply to judicial

factfinding that increases a minimum sentence so long as the sentence does not exceed the applicable statutory maximum." Chontos v. Berghuis, 585 F.3d 1000, 1002 (6th Cir. 2009) (citing Harris v. United States, 536 U.S. 545, 563-68 (2002) (plurality opinion) and 569-70 (Breyer, J., concurring)), cert. denied, __ U.S. __, 130 S. Ct. 3413 (2010). Petitioner's sentence did not exceed the statutory maximum of life imprisonment or any number of years. Therefore, his Blakely claim lacks merit.

## IV. CONCLUSION AND ORDER

Petitioner's claims lack merit, and the state courts' opinions and orders rejecting the claims did not result in decisions that were contrary to clearly established federal law as determined by the Supreme Court, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts. Accordingly, the petition and amended petition for a writ of habeas corpus are **DENIED**.

## V. CERTIFICATE OF APPEALABILITY

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

To obtain a certificate of appealability under § 2253(c), a habeas prisoner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented

were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quotation marks and citation omitted). When, as here, "a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. at 484.

Reasonable jurists could not find the Court's assessment of Petitioner's claims debatable or wrong. The Court therefore declines to issue a certificate of appealability on any of Petitioner's claims. Petitioner nevertheless may proceed in forma pauperis on appeal because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

Dated: February 21, 2012
Detroit, Michigan

CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was served upon the Petitioner, via ordinary U.S. Mail, and Counsel for the Respondent, electronically.

s/Bernadette M. Thebolt
Case Manager